JOHN AVALOS ALBA,                    §
                                     §
              Petitioner,            §
                                     §
*versus*                             §          CIVIL ACTION NO. 1:04-CV-639
                                     §
NATHANIEL QUARTERMAN, Director,      §
Texas Department of Criminal Justice,§
Correctional Institutions Division,  §
                                     §
              Respondent.            §

### MEMORANDUM AND ORDER

John Avalos-Alba ("Alba"), an inmate confined by the Texas Department of Criminal

Justice, Correctional Institutions Division, seeks a writ of *habeas corpus* pursuant to 28 U.S.C.

§ 2254. Alba challenges his death sentence imposed by the 199th Judicial District Court of Collin

County, Texas, in Cause No. 219-81215-91, styled *The State of Texas vs. John Avalos Alba*.

Having reviewed the submissions of the parties, the state court record, and the applicable law, the

Court finds the petition to be without merit.

I.     Facts

The details of the crime are summarized in *Alba v. State*, 905 S.W.2d 581 (Tex. Crim.

App. 1995), *cert. denied*, 516 U.S. 1077 (1996):

> On the morning of August 5, 1991, [Alba] went to the Plano Pawn Shop
> and purchased a .22 caliber semi-automatic pistol and a box of ammunition. At
> approximately 10:00 p.m. that evening, he arrived at the apartment of Gail Webb
> ["Webb"] and Bob Donoho ["Donoho"] looking for his wife, Wendy. Upon
> finding Wendy at the residence, [Alba] sought to gain entry while Wendy and
> Webb attempted to shut the door on his arm. [Alba] eventually fired his pistol into
> the back of the door and forced his way into the apartment. He told Wendy and
> Webb that "you bitches deserve this." [Alba] then grabbed Wendy by the hair and
> pulled her halfway out of the apartment where he proceeded to pistol whip and

shoot her three times. He shot her in the back of her head, her buttocks, and the middle of her back severing her spinal cord. She later died at the hospital.

[Alba] next went after Webb, who had run into the kitchen and was now crouching on the floor. [Alba] stood over her and laughingly stated, "you deserve to die, bitch." He then shot her six times in the head and arms. Webb survived the attack.

During this time, Donoho had gone to the back bedroom to place an emergency "911" call. When he came out to check on Wendy and Webb, [Alba] asked him, "You want some of this?" and fired a shot at Donoho's head, missing by about twelve to fifteen inches.

Upon leaving the apartment, Alba was confronted by Misty Magers ["Magers"], the apartment manager, her boyfriend, and a neighbor. When Magers ran to call for help, [Alba] fired a shot in her direction and yelled, "I'm going to get you too, Misty." He then turned the gun on the other two and asked, "Do you want any of this?" They let Alba pass. As [Alba] was attempting to finally leave the complex, he ran into Officer Wallace Moreland ["Moreland"] of the Allen Police Department. Alba told Moreland, "I'm getting the hell out of here. There's a crazy son of a bitch over there shooting people." [Alba] then left. Moreland did not stop him because he was unaware that [Alba] was involved in the crime.

[Alba] left the scene in his own car at a high rate of speed. He later abandoned his vehicle in Plano and fled on foot to a Plano bowling alley. There he came upon Ryan Clay ["Clay"], a teenager, working on a car in the parking lot. [Alba] asked for a ride and, when Clay stated that it was not his car, [Alba] pointed his gun at him and again asked for a ride. Clay complied. However, before they could leave the parking lot, sixteen-year old Michael Carr ["Carr"], the owner of the car, stopped them. Carr, realizing that something was not right, drove [Alba] as requested to a nearby neighborhood. [Alba] was apprehended on August 6, 1991, after a lengthy stand-off with the police at a retail shopping center in Plano.

II.    Background

On November 19, 1991, Alba was indicted for capital murder under Section 19.03(a)(2) of the Texas Penal Code for intentionally committing murder during the course of a burglary. Alba pleaded not guilty. On May 7, 1992, after being found guilty at a jury trial, he was sentenced to death. His conviction and sentence were affirmed on direct appeal. *See Alba v. State*, 905 S.W.2d 581 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1077 (1996). Alba then

applied for a writ of *habeas corpus*, which the state court denied. *See Ex parte Alba*, No. 36711-01 (Tex. Crim. App. Apr. 15, 1998), *cert. denied*, 525 U.S. 967 (1998). On August 21, 2000, however, the United States Court of Appeals for the Fifth Circuit vacated Alba's death sentence. *See Alba v. Johnson*, 232 F.3d 208 (5th Cir. 2000). Alba was then retried on the issue of punishment only. On March 1, 2001, he was again sentenced to death. His death sentence was affirmed on direct appeal. *See Alba v. State*, No. 71487, 2003 WL 1888989 (Tex. Crim. App. Apr. 16, 2003), *cert. denied*, 541 U.S. 1065 (2004). He then sought a writ of *habeas corpus* in state court, which was denied. *See Ex parte Alba*, No. 36711-02 (Tex. Crim. App. Oct. 15, 2003).

On June 23, 2005, Alba filed his amended petition for a writ of *habeas corpus* in this Court. The Court stayed Alba's federal proceedings on February 3, 2006, so that he could return to state court and present a claim that the lethal injection procedure utilized in Texas violates the Eighth Amendment's ban on cruel and unusual punishment. The state court ultimately dismissed Alba's claim. *See Ex parte Alba*, 256 S.W.3d 682 (Tex. Crim. App. 2008). Consequently, on July 15, 2008, this Court lifted its stay of these proceedings. On July 14, 2008, Alba moved the Texas Court of Criminal Appeals for leave to file another petition for *habeas corpus* relief, but his request was denied. *See Ex parte Alba*, No. WR-36711-04, 2008 WL 4356934 (Tex. Crim. App. Sept. 24, 2008).

III.    Claims Presented

Alba raises twenty-five claims in his petition:

1.    The State's decision-making during his trial was rooted in racial bias in violation of the Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution.

2.     Because racism infected the sentencing process, the imposition of the death penalty in this case constitutes cruel and unusual punishment in violation of the Eighth Amendment.

3.     Evolving standards of justice decry the imposition of death sentences that are based upon racial concerns.

4.     His rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Texas Constitution were violated by the empaneling of a jury that was not selected from a fair cross-section of the community.

5.     The process by which Collin County selects its grand juries produces an unconstitutional under-representation of Hispanics and African Americans in violation of the Sixth and Fourteenth Amendments.

6.     The systematic exclusion of Hispanics and African Americans as grand jury forepersons violates the Equal Protection Clause.

7.     The Texas Code of Criminal Procedure's prohibition against informing jurors that a single holdout juror will cause the imposition of a life sentence violates his rights under the Eighth and Fourteenth Amendments.

8.     The many varied and independent capital-charging procedures employed by different prosecutors to determine when to seek the death penalty violate the Equal Protection Clause.

9.     The capital sentencing scheme utilized in Texas violates the Fifth, Eighth, and Fourteenth Amendments.

10.     Prosecutorial misconduct committed before and during his trial violated the Due Process Clause and his right to a fair trial under the Fifth and Fourteenth Amendments and the Texas Constitution.

11.     The negative publicity surrounding the "Texas Seven" inflamed the jury in this case and violated his right to a fair trial as well as his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

12.     Pretrial publicity regarding a prison escape tainted the jury pool in Collin County, Texas, rendering it fundamental error for the trial court to deny his motion to continue his second trial.

13.     The trial court improperly denied his motion to exclude questions regarding or references to prison escapees Gus Garcia and Martin Gurule.

14.     His trial counsel rendered ineffective assistance in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.

15.     His appellate counsel rendered ineffective assistance.

16.     The trial court committed fundamental error in granting the State's motion to exclude evidence of Wendy Alba's ("Wendy") alleged affairs, as such evidence was relevant to his heat of passion defense and mitigation and forced him to testify in violation of his rights under the Fifth and Sixth Amendments.

17.     The trial court committed fundamental error in denying his motion to exclude references to his website, as such evidence indicated that a death sentence was previously imposed in this case and forced him to testify in violation of his rights under the Fifth and Sixth Amendments.

18.     Because he suffers from impulsive aggression, an illness similar to mental retardation, executing him would constitute cruel and unusual punishment.

19.     The Texas capital sentencing scheme violates the Sixth, Eighth, and Fourteenth Amendments by permitting a jury to find facts by a standard of less than "beyond a reasonable doubt."

20.     Texas courts do not give a limiting instruction regarding the meaning of terms in special issue questions as required by the constitutional prohibition against arbitrary and capricious imposition of the death penalty.

21.     The method of execution utilized in Texas violates the Eighth and Fourteenth Amendments.

22.     Although allowed in a non-capital case, the Texas sentencing scheme forbids a jury instruction regarding the parole implications of a life sentence in a capital case in violation of the Equal Protection Clause.

23.     The trial court violated the Eighth and Fourteenth Amendments by failing to instruct the jury that a life sentence would render him ineligible for parole for twenty years.

24.     His prolonged stay on death row violates the Eighth Amendment's ban on cruel and unusual punishment.

25.     The cumulative effect of the above enumerated constitutional violations denied him due process of law under the Fifth and Fourteenth Amendments even if no separate infraction rises to that magnitude.

IV.     Standard of Review

Because Alba's application for *habeas corpus* was filed after 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to his claims.   Under the AEDPA, "a state prisoner seeking to raise claims in a federal petition for habeas corpus ordinarily must first present those claims to the state court and must exhaust state remedies." *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001) (citing 28 U.S.C. § 2254(d)), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002).  If the last state court to consider the claims expressly based its denial of relief on independent and adequate state procedural grounds, the petitioner's claims are considered to have been defaulted, and federal habeas review is barred unless the petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law or shows that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If a state court denies a petitioner's claims on the merits, a federal court may grant habeas relief only if the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In such a situation, the court reviews questions of law and mixed questions of law and fact under the first of these standards, while it reviews questions of fact under the second. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001).  The state court's findings of fact are presumed to be correct, and the petitioner

has the burden of rebutting this presumption through clear and convincing evidence. *Richardson v. Quarterman*, 537 F.3d 466, 473 (5th Cir. 2008).

If the state court based its denial of relief on both procedural and substantive grounds, the general rule in this circuit is that, in the absence of good cause and prejudice or a fundamental miscarriage of justice, a reviewing federal district court must deny relief due to the procedural default. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006). This rule, however, is not absolute. A court may look past the question of procedural default if claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir.), *cert. denied*, 528 U.S. 1081 (2004).

V.    Analysis

   A.    Racial Bias in Proceeding

Given that he is Hispanic and both Wendy and Webb are Caucasian, Alba first claims that the prosecution's decision-making in this case was rooted in racial bias in violation of the Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution. The state court found this claim to be procedurally barred because Alba did not raise it during his first trial, at his re-sentencing hearing, or on his direct appeal. The state court also denied the claim on the merits. Alba contends that he had good cause for not raising this issue until his most recent state post-conviction proceeding. He avers that, until that time, he had no reason to assume that the racism of the Collin County prosecutor's office was systematically tied to all of its decisions regarding when to seek the death penalty. Thus, the relevant question is when Alba should have been aware of a potential claim.

In February 2003, Alba argued in his post-conviction brief that "[t]he racial intent of the Collin County prosecutor was clear throughout (Alba's) first trial." In support of this assertion, Alba cited evidence of alleged disparate treatment in Collin County death penalty cases from "the past ten years." Alba, however, never identified the beginning or end dates of the ten-year period to which he referred, nor did he state when the statistics for that period became available. Without this information, the Court cannot determine whether Alba's failure to raise his claim at his re-sentencing hearing or on direct appeal from that hearing (both of which took place in 2001) was truly due to circumstances beyond his control. Therefore, because Alba has not established good cause for failing to raise his claim at either his re-sentencing hearing or during his direct appeal from that proceeding, his claim is barred from review under the doctrine of procedural default. *See Coleman*, 501 U.S. at 753 (noting that a petitioner must ordinarily prove that an external factor impeded his ability to comply with procedural rules in order to establish cause). Thus, Alba's first claim must be dismissed.

B.    Racism at Sentencing

Contending that racism infected the sentencing process, Alba next claims that his death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. The state court found this claim to be procedurally barred because it was not raised at his re-sentencing hearing or on direct appeal from that hearing. Alba asserts that the state court's ruling was incorrect, insisting that he had good cause for not raising this claim before trial because the evidence on which it is based was not discovered until after trial. This Court has already determined in its analysis of the previous claim that such an argument is insufficient to establish good cause for not previously raising a related racism claim.

Alba also maintains that the doctrine of procedural default does not apply where state law is arbitrary on its face or as applied, violates the Due Process Clause, serves only to frustrate the enforcement of federal rights, requires objection before any error becomes reasonably apparent, or is not regularly followed by the state court. He cites no authority, however, indicating that the state court's procedural requirement that his claim be raised at trial or on direct appeal suffers from any of these deficiencies. Indeed, the Fifth Circuit has previously upheld Texas's contemporaneous objection rule in the context of reviewing the denial of habeas relief on procedural grounds. *See Rogers v. Scott*, 70 F.3d 340, 342 (5th Cir. 1995), *cert. denied sub. nom Rogers v. Johnson*, 517 U.S. 1235 (1996). As Alba has not established good cause for failing to raise his claim either at trial or on direct appeal, the doctrine of procedural default bars the Court from reviewing his second claim.

C.    Sentencing Based on Racial Concerns

Alba's third claim is that evolving standards of justice decry the imposition of death sentences that are based upon racial concerns. As with his first two claims, the state court found that this claim was barred from review because it was not raised at either his re-sentencing hearing or in his direct appeal of that hearing. Alba contends that there is now an unambiguous national consensus that the process by which a death sentence is imposed should be free from bias and racial discrimination. He asserts that he did not raise this claim at trial because the evidence on which it is based was not discovered until after his trial. He does not argue that the evidence on which his claim was based was unavailable until after his re-sentencing hearing (or after he filed his direct appeal from that hearing), however, so he cannot establish that he had good cause for

failing to follow the state court's procedural requirements. Hence, Alba's third claim warrants dismissal under the doctrine of procedural default.

D.      Unrepresentative Jury Pool

Alba's fourth claim is that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 1, Sections 3, 10, 13, 15, and 19 of the Texas Constitution were violated when a jury venire was not selected from a fair cross-section of the community. Because this claim was denied on the merits by the state court, this Court must determine whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law.

The Supreme Court has made it clear that an accused is entitled to a jury that is drawn from a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 527-28 (1975). To establish a violation of this requirement, Alba must show: "(1) that the group alleged to be excluded is a 'distinctive group' within the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Alba contends that Collin County's method of summoning and reimbursing jurors systematically excludes Hispanics and younger people. According to Alba, Collin County summons jurors based upon the names and addresses contained in its voter roles. The county, however, does not independently update its voter roles with information supplied by the Secretary of State but, rather, waits to receive new voter roles every six years. Because Hispanics and younger people purportedly move more frequently than other groups, Alba contends that the

10

Collin County system routinely sends out more incorrectly addressed summonses to Hispanic Americans and younger people. Alba also asserts that Hispanics and younger people are more likely to be poor than other groups. Given that Collin County pays only six dollars per day to reimburse jurors, Alba laments that Hispanics and younger people are less likely to report for jury duty because they cannot afford to forego their employment.

Assuming *arguendo* that Alba's contentions are true, they still do not establish that the Collin County jury pool selection system systematically excludes distinctive groups. Regarding the six-dollar compensation, the Supreme Court has declared, "[j]ury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power." *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 224 (1946). Accordingly, discrepancies resulting from the private choices of individuals to ignore jury summonses do not exemplify the type of constitutional infirmity contemplated in *Duren*. *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006). Similarly, a county's failure to update voter lists more rapidly than what is statutorily required does not constitute systematic exclusion. *Id*. Alba's arguments are, therefore, insufficient to establish that his jury venire was not drawn from a fair cross-section of the community. Consequently, because the state court's denial of his claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Duren*, Alba's fourth claim is without basis. *See* 28 U.S.C. § 2254(d)(1).

E.      Unrepresentative Grand Jury

Alba's fifth claim is that the process by which Collin County selects its grand juries produces an unconstitutional under-representation of Hispanics and African Americans in violation

of the Sixth and Fourteenth Amendments. This claim was denied on the merits by the state court, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

Alba's fifth claim consists of two sub-claims—a Sixth Amendment fair cross-section sub-claim and an Equal Protection Clause sub-claim. Regarding the Sixth Amendment sub-claim, while the Supreme Court has clearly established that petit jury venires must represent a fair cross-section of the community, it has expressly refused to decide whether this requirement likewise applies to grand juries. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972). For this Court to do so would constitute a new rule of criminal procedure not dictated by existing precedent; such rules cannot form the basis for relief in *habeas corpus*. *See Teague v. Lane*, 489 U.S. 288, 316 (1989). Accordingly, the state court's rejection of Alba's Sixth Amendment sub-claim is neither contrary to the federal law clearly established in *Taylor*, nor is it the result of an unreasonable refusal to apply existing precedent to the present case.

As to Alba's second sub-claim, in order to establish a *prima facie* case of discrimination under the Equal Protection Clause, a defendant must demonstrate that: (1) any allegedly underrepresented groups are recognizable, distinct classes singled out for different treatment under the laws, as written or as applied; (2) substantial under-representation has occurred over a significant period of time; and (3) the court utilized a selection procedure that either was not racially neutral or was susceptible to abuse. *Cantenada v. Partida*, 430 U.S. 482, 494 (1977).

Alba contends that he can demonstrate substantial under-representation of Hispanics and African Americans in Collin County grand juries by use of a statistical device known as a standard deviation.

> A standard deviation is a measure of the extent to which an observed result is likely to vary from an expected result. The larger the number of standard deviations, an observed result is from the expected result, the lower the probability that the observed result is random. More specifically, in the context of racial discrimination claims, the larger the number of standard deviations, the more likely the observed result is the result of discrimination, rather than chance.

*Jefferson v. Morgan*, 962 F.2d 1185, 1189 (6th Cir.), *cert. denied*, 506 U.S. 905 (1992). When considering allegations of racial discrimination, the standard deviation is calculated by computing the square root of the product of the total number of jurors summoned over a particular period of time, the probability of selecting a minority juror, and the probability of selecting a non-minority juror. *Castenada*, 430 U.S. at 496 n.17. If this calculation indicates a difference of more than two or three standard deviations between the observed number of minorities in a community and the expected number of minority jurors, then the hypothesis that jurors were selected without regard to race is likely suspect. *See id.*

Here, Alba asserts that in Collin County in the ten years prior to his trial, less than 2% of grand jury panelists were Hispanic and less than 1% were African American. Because the percentage of Hispanics in the general population at this time was 10% and the percentage of African Americans was 5%, Alba avers that the grand jury selection process in Collin County clearly falls below constitutional standards. Alba, however, never argues that the observed percentage of minority grand jurors differs more than two or three standard deviations from the expected percentage of minorities. Indeed, he never computes the standard deviation or provides the total number of jurors summoned during the relevant ten-year period. Moreover, Alba has not adduced evidence concerning the racial composition of those actually eligible for jury duty—American citizens over age eighteen without felony convictions. Thus, the Court is unable to perform the necessary calculation. Accordingly, because Alba has failed to establish that

Hispanics and African Americans are substantially under-represented, the state court's denial of his Fourteenth Amendment claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, as Alba is not entitled to relief on either of his two sub-claims, his fifth claim is denied.

      F.      <u>Racially Motivated Selection of Grand Jury Forepersons</u>

Alba's sixth claim is that the systematic exclusion of Hispanics and African Americans as grand jury forepersons violates the Equal Protection Clause. This claim was denied on the merits by the state court. Consequently, this Court must determine whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law.

In *Rose v. Mitchell*, the Supreme Court held that racial discrimination in the selection of grand jury forepersons is a valid ground for setting aside a criminal conviction. 443 U.S. 545, 564-65 (1979). To establish a *prima facie* case of racial discrimination in the selection of grand jury forepersons, a petitioner must first establish that he is a member of a group recognizable as a distinct class capable of being singled out for different treatment under the laws. *Id*. at 565 (citing *Castaneda*, 430 U.S. at 494). The petitioner must then demonstrate substantial under-representation, comparing the proportion of the group in the total population eligible to serve to the proportion called to serve as grand jury forepersons over a significant period of time. *Id*. Finally, the petitioner must show that the court employed a grand jury foreperson selection procedure that was susceptible to abuse or not racially neutral. *Id*.

In *Rose*, the petitioner contended that no African American had been appointed as a grand jury foreperson in twenty-two years, although African Americans constituted approximately thirty percent of the population in the county at issue. *Id.* at 570-71. The Court held that this evidence

was insufficient to establish substantial under-representation because the petitioner failed to provide the number of grand jury forepersons appointed during the relevant time period. *Id.* at 571-72. The Court explained, "[i]nasmuch as there is no evidence in the record of the number of foremen appointed, it is not possible to perform the calculations and comparisons needed to permit a court to conclude that a statistical case of discrimination had been made out . . . ." *Id.*

In the present case, Alba posits that no Hispanic has been appointed as a grand jury foreperson in Collin County for the past ten years although Hispanics constitute ten percent of the county's population. Like the petitioner in *Rose*, however, Alba fails to provide the total number of grand jury forepersons appointed during the relevant time period. Accordingly, this Court cannot perform the comparisons and calculations needed to determine whether the purported under-representation of Hispanic grand jury forepersons in Collin County is substantial. Because Alba cannot establish a *prima facie* claim of racial discrimination, the state court's rejection of his claim must be upheld as neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined in *Rose*. *See* 28 U.S.C. § 2254(d)(1). Denial of Alba's sixth claim is, therefore, warranted.

G.      Failure to Give Holdout Juror Instruction

Next, in his seventh claim, Alba alleges that the Texas Code of Criminal Procedure's prohibition against informing jurors that a single holdout juror will result in the imposition of a life sentence violates his rights under the Eighth and Fourteenth Amendments. The state court found that this claim was procedurally barred because it was not raised during the direct appeal of Alba's re-sentencing hearing. Alternatively, the state court denied the claim on the merits.

Alba has not established good cause for failing to raise this claim at his trial or on appeal, nor that a fundamental miscarriage of justice would occur if the Court did not address the merits of his claim. Thus, the doctrine of procedural default bars the Court from reviewing his seventh claim and mandates dismissal of the claim.

      H.    <u>Inconsistent Capital-Charging Procedures</u>

Alba's eighth claim is that the many varied and independent capital charging procedures employed by different prosecutors in determining when to seek the death penalty violate his rights under the Equal Protection Clause. The state court denied this claim on the merits and also found that it was procedurally barred because Alba did not raise it at his trial or on direct appeal. As Alba has failed to establish good cause for failing to raise this claim or that a fundamental miscarriage of justice would occur if the Court did not address the merits of the claim, Alba's eighth claim is barred from review under the doctrine of procedural default. Accordingly, dismissal of this claim is warranted.

      I.    <u>Unconstitutional Sentencing Scheme</u>

In his ninth claim, Alba argues that the capital sentencing scheme utilized in Texas violates his rights under the Fifth, Eighth, and Fourteenth Amendments. The state court found that this claim was procedurally barred because Alba failed to raise it at his re-sentencing hearing or on his direct appeal from that hearing. Given that Alba has failed to establish either that he had good cause for failing to raise this claim or that a fundamental miscarriage of justice would occur if the Court declined to address the substance of the claim, the Court finds that this claim is barred from review under the doctrine of procedural default and that dismissal of Alba's ninth claim is appropriate.

J.     Prosecutorial Misconduct

Alba's tenth claim is that prosecutorial misconduct committed before and during his trial violated the Due Process Clause and his right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 10, 13, 15, and 19 of the Texas Constitution. The state court found this claim to be procedurally barred because it was not raised on direct appeal. The court also denied the claim on the merits. Because Alba has failed to establish either that he had good cause for failing to raise his claim on direct appeal or that a fundamental miscarriage of justice would occur if the Court did not address the merits of his claim, this claim is procedurally defaulted and subject to dismissal.

K.     Prejudice Resulting from Pretrial Publicity

Alba's eleventh and twelfth claims are both based upon the contention that negative publicity surrounding the "Texas Seven" deprived him of his right to trial by an impartial jury. In his eleventh claim, Alba asserts that he was denied a fair trial because the jurors in his case were prejudiced by a combination of inflammatory pretrial publicity about a prison escape as well as the State's references to the escape during his re-sentencing hearing. In his twelfth claim, Alba argues that the publicity alone prejudiced the jury, rendering it fundamental error for the trial court to have denied his pretrial motion for a continuance. The state court found that both claims were barred from consideration on procedural grounds and, alternatively, that the relief sought was not warranted. This Court agrees that Alba's eleventh claim was procedurally defaulted because it was not presented in his direct appeal.[1] *See generally Alba*, 2003 WL 1888989. Thus,

---

[1]    On direct appeal, although Alba argued that he was prejudiced by pretrial publicity concerning the escape of the Texas Seven, he did not contend that he was also prejudiced by a combination of media coverage and comments made by the State at trial. He raised this claim for the first time in his state post-conviction proceedings. The state court, however, incorrectly held that this claim was barred from review

17

in view of the fact that Alba has not established good cause for failing to raise this claim on direct appeal or that a fundamental miscarriage of justice would occur if the Court does not address the merits of the claim, his eleventh claim is barred from consideration under the doctrine of procedural default.

Unlike his eleventh claim, Alba presented his twelfth claim on the direct appeal of his re-sentencing hearing. Therefore, the Court must determine whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law.

Before and during Alba's re-sentencing hearing, the news media gave extensive coverage to the progress of seven inmates who escaped from the Connally Unit of the Texas Department of Criminal Justice in Kenedy, Texas. The escapees killed a peace officer in Irving, Texas, during a robbery in which they obtained numerous firearms and were believed for some time to be in the Dallas vicinity. After several weeks as fugitives, one escapee committed suicide, and the other six were captured in Colorado. The Texas media covered all aspects of the story. Indeed, Alba attached to his motion for continuance some twenty articles from *The Dallas Morning News* reporting on these events.

A defendant is entitled to a panel of impartial, indifferent jurors who base their decision solely on the evidence presented in court. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Widespread prejudicial pretrial publicity can create a presumption that the entire community has been exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue.

---

because it had been raised and decided on direct appeal. Instead, Alba's combination claim was procedurally defaulted because it was not raised on direct appeal. *See Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998).

*See Irvin v. Dowd*, 366 U.S. 717, 725-29 (1961). Alba claims that, due to the extensive media coverage of the "Texas Seven" escape, the state court should have presumed that the entire community was prejudiced against him. In support of this contention, Alba notes that his primary argument at the sentencing stage of his trial was that he would not be dangerous in the future so long as he was kept in prison. For these reasons, Alba avers that the trial court should have granted his motion for continuance.

Having reviewed the newspaper articles and assuming *arguendo* that the entire community was exposed to news reports regarding the Connally Unit escape, the Court finds that the publicity was not so prejudicial that jurors could not be fair in evaluating the likelihood that Alba would be dangerous in the future. Cases in which courts have found inherent prejudice typically involve facts far more extreme than those presented in this case. For example, in *Rideau v. Louisiana*, a local television station repeatedly broadcast a film of the defendant confessing to the crime for which he was about to stand trial. 373 U.S. 723, 724 (1963). The instant case appears more analogous to *United States v. Rezaq*, which involved a member of a Palestinian terrorist organization who was on trial for hijacking a commercial aircraft. 134 F.3d 1121 (D.C. Cir.), *cert. denied*, 525 U.S. 834 (1998). The night after the prosecution made its closing argument in *Rezaq*, the news media began intensive and extensive coverage of the crash of TWA Flight 800, openly speculating whether terrorists were responsible. *Id.* at 315. On appeal, Rezaq contended that this inflammatory publicity improperly prejudiced jury deliberations. *Id.* at 301. The District of Columbia Circuit found that the risk of prejudice from the unrelated crash publicity, although real, did not warrant a new trial. *Id.* at 316. Similarly, although publicity regarding the Connally Unit escape may have had some effect on the jurors' assessment of whether Alba would pose a

danger to society if he received a life sentence, its effect was likely significantly less than the prejudice that would have been generated by publicity involving Alba personally. Accordingly, the Court finds that the state court's rejection of Alba's twelfth claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Thus, Alba's twelfth claim must be rejected.

L.     Failure to Exclude Evidence Regarding Death Row Inmates

Alba's thirteenth claim is that the trial court improperly denied his motion to exclude questions about or references to death row inmates Gustavo Garcia ("Garcia") and Martin Gurule ("Gurule"). The state court held that this claim was procedurally barred because it was not raised in Alba's direct appeal from his re-sentencing hearing. It also made findings that supported denying relief on the merits of the claim. As the Court elects to address this claim on the merits rather than decide it on procedural grounds, the issue to be resolved is whether the state court's rejection of the claim was the result of an unreasonable determination of the facts in light of the evidence presented in his state post-conviction proceedings.

After the jury in Alba's re-sentencing hearing was sworn, the trial judge instructed them not to read, listen to, or watch any news accounts of Alba's case or of the cases of Garcia and Victor Saldaño ("Saldaño").[2] At the hearing, the defense called five prison employees to testify about Alba's good conduct while incarcerated. During the cross-examination of David Murray and Patrick Rolley ("Rolley"), the second and third of these witnesses, the State asked about

---

[2]     Like Alba, Garcia and Saldaño were granted new sentencing hearings because the psychologist who testified for the State at their trials opined that their Hispanic ethnicity was a factor that weighed in favor of a future dangerousness finding. *See Saldaño v. Texas*, 530 U.S. 1212, 1212 (2000); *Saldaño v. Roach*, 363 F.3d 545, 549 (5th Cir.), *cert. denied*, 543 U.S. 820 (2004); *Garcia v. Johnson*, No. 99-CV-134 (E.D. Tex. Sept. 7, 2000). The trial judge was apparently concerned that articles about Garcia and/or Saldaño might contain references to, or information about, Alba's case.

inmates Garcia and Gurule. Neither witness knew Garcia, but both knew Gurule. They confirmed that Gurule led a breakout from the Ellis Unit in 1998. Rolley further testified that he never had any problems with Gurule and that, because of his good conduct, Gurule was made an orderly, a position which gave him more freedom than a typical death row inmate. After Rolley was excused, defense counsel moved for exclusion, stating:

> During the last examination and cross-examination of the last several witnesses, there's been references to Gus Garcia and to Gurule. Gus Garcia, of course, is one of the cases that you've instructed the jury about and talked with them as regards not seeing anything there. [The State] has made the tie with Gurule and Gus Garcia with at least one of the witnesses and, therefore, should they look up anything about Gurule, then, obviously—and that's the named defendant in all of that, and it's an easy jump, if they haven't already made it, to—that these were death-row inmates and not just capital murderers. And so, therefore, we would object to any future reference to that and ask that the Court to limit the questions by the State as regards—and should exclude any references to either Gus Garcia or Gurule.

Alba incorrectly claims that Garcia[3] participated in the escape of the "Texas Seven" and argues that it was error for the trial court to allow references to Garcia and Gurule. As shown by the above quote, however, defense counsel's objection appears to have been based upon two grounds. First, he argues that if jurors sought information regarding Gurule, they might come across information about Garcia, which the court instructed them to avoid. Second, he contends that if the jurors searched for information about either Garcia or Gurule, they would learn that they were involved in an attempted escape from the unit housing death row inmates. After

---

[3]   Alba appears to confuse Gustavo Garcia with Joseph C. Garcia, who was one of the seven inmates who escaped from the Connally Unit in 2000. *See* Michael Janofsky, *4 of 7 Texas Fugitives Captured in Colorado as 5th Kills Himself*, THE NEW YORK TIMES, Jan. 23, 2001, at A1. Gustavo Garcia was part of the attempted breakout from the Ellis Unit in 1998, which was led by Gurule. *See* Michael Graczyk, *Inmate who Tried Fleeing Death Row Loses Appeal*, FORT WORTH STAR-TELEGRAM, Oct. 16, 2008, at B11. Only Gurule was successful in escaping; he was found dead a week later in a river not far from the prison. *Id.*

confirming that the defense's request was to prevent the State from making any inquiries regarding Garcia or Gurule, the court denied the defense's motion to exclude.

While Alba insists that it was error for the trial court to deny his motion, he does not allege that the prosecution asked additional questions or made further references to Garcia or Gurule during the remainder of his re-sentencing hearing. Because the questions and comments about which Alba complains occurred before he requested that the court forbid them, not after it refused to do so, and because Alba never asked the court to instruct the jury to disregard the State's earlier questions and remarks, the trial court's denial of Alba's motion has no causal connection to the prejudice of which he complains. Hence, any error committed by the trial court in denying the Alba's motion was harmless. Accordingly, Alba's thirteenth claim is without merit, as the state court's rejection of this claim was not the result of an unreasonable determination of the facts in light of the evidence presented in his state post-conviction proceedings. *See* 28 U.S.C. § 2254(d)(2).

M.     Ineffective Assistance of Trial Counsel

Alba's fourteenth claim is that his trial counsel rendered ineffective assistance in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. Because this claim was denied on the merits by the state court, the issue for this Court is whether the state court's decision was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

To demonstrate that his defense lawyer's performance fell below that which is constitutionally acceptable, Alba must show that counsel's performance was deficient and that the deficiency prejudiced his defense. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing

*Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Deficient performance requires proof that counsel's representation fell below the objective standard of reasonableness established by prevailing professional norms. *Id*. Additionally, in order to demonstrate that counsel's performance prejudiced his defense, Alba must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See id*. at 534.

Alba's fourteenth claim contains eleven sub-claims. Alba first argues that his trial counsel should have moved to dismiss the case or to force a plea agreement that would have allowed him to plead guilty in exchange for a sentence of life imprisonment. Alba contends that a simple reading of the briefs in his previous trial would have revealed the need to investigate this claim further. Alba, however, neither alleges nor demonstrates that there is a reasonable probability that either the motion or the plea negotiations would have been successful. Indeed, the state court specifically found that it had no authority to dismiss the case or force the State to forego seeking the death penalty a second time. Moreover, because Alba had already been adjudged guilty at his first trial, an offer to enter into a plea agreement at that juncture would likely have been unavailing. Thus, the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Wiggins*.

Secondly, Alba alleges that defense counsel should have moved for a change of venue due to the publicity surrounding the "Texas Seven" prison escape, which occurred during his re-sentencing hearing. In *Sheppard v. Maxwell*, the Supreme Court stated, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should

continue the case until the threat abates, or transfer it to another county not so permeated with publicity." 384 U.S. 333, 363 (1966). Although Alba's attorneys did not request a change of venue, they did move for a continuance. Alba cites no authority, nor does he contend, that filing a motion for continuance, rather than a motion to change venue, was unreasonable under prevailing professional norms. Indeed, a change of venue would have been fruitless, as there was widespread publicity concerning the prison break throughout the state. Hence, the Court finds that the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In his third and fourth sub-claims, Alba contends that his trial counsel failed to perform a proper investigation of his future dangerousness and mental health issues. Specifically, Alba argues that defense counsel failed to obtain a psychological evaluation of him or to ask his psychiatric expert, Gilda Kessner, Psy.D. ("Dr. Kessner"), to evaluate the probability that he would commit future acts of violence if he were not imprisoned.

In order to establish that counsel was ineffective due to a failure to investigate the case or discover and present evidence, the petitioner must do more than merely allege a failure to investigate—he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *See Moore v. Quarterman*, 534 F.3d 454, 468 n.23 (5th Cir. 2008); *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003); *United States v. Glinsey*, 209 F.3d 386, 393 (5th Cir.), *cert. denied*, 531 U.S. 919 (2000); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993).

Moreover, an attorney's decision to conduct or not to conduct pretrial investigation, when it is a "conscious and informed decision on trial tactics and strategy," cannot form the basis for federal habeas corpus relief unless "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Skinner v. Quarterman*, 528 F.3d 336, 341 (5th Cir. 2008) (citations omitted); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2133 (2007); *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (2003), *cert. denied sub nom. Cotton v. Dretke*, 540 U.S. 1186 (2004); *United States v. Jones*, 287 F.3d 325, 331 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002); *see also Strickland*, 466 U.S. at 690-91; *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). "Tactical and strategical decisions of counsel 'if based on informed and reasoned practical judgment' will not be second-guessed." *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir.) (quoting *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989)), *cert. denied*, 522 U.S. 944 (1997). As the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91); *see Ries v. Quarterman*, 522 F.3d 517, 527 (5th Cir.), *cert. denied*, 129 S. Ct. 485 (2008); *del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1478 (2008).

Here, Alba claims that the reports of the State's psychologist, Walter Y. Quijano, Ph.D., and one of the defense's experts, Phillip J. Murphy, Ph.D. ("Dr. Murphy"), put his attorneys on

notice that he suffered from brain injuries and mental disorders which warranted further investigation. In particular, Alba claims that a psychological evaluation would have helped the jury understand why he killed his wife and why he would not likely re-offend if treated. Further, Alba claims that additional inquiry by Dr. Kessner into his future dangerousness if given medical treatment in lieu of imprisonment would have been relevant because, under Texas law at the time of his re-sentencing, if he had not been sentenced to death, he would have received a sentence of life imprisonment with the possibility of parole. Alba, however, offers no evidence indicating what further examination into his mental condition would have revealed. Similarly, he does not describe the nature of the testimony Dr. Kessner would have offered if defense counsel had asked her to predict the likelihood of Alba's committing future acts of criminal violence if not incarcerated.

Moreover, counsel's decision to forgo additional inquiry into these issues appears to have been the result of an informed, strategic decision. In his report, Dr. Murphy opined that Alba was not brain damaged or suffering from any mental disorder. Instead, Dr. Murphy reported that Alba was "functioning in the Bright Normal range of intelligence," that "tests of neuropsychological functioning were basically within normal limits," and that Alba possessed a normal or above-normal ability to remember, learn new information, and retain information. Based on this assessment, counsel could have reasonably deduced that further psychological evaluation would not have assisted Alba's defense. Indeed, it appears that additional investigation could have disclosed evidence of future dangerousness given that Dr. Murphy also hypothesized that Alba suffered from an inability to change his cognitive set once it proved unsuccessful and suggested that he could pose a threat to society unless treated and imprisoned. Similarly, although Dr.

Kessner testified that Alba posed only a six-percent risk of committing future acts of violence if he remained incarcerated, further inquiry regarding Alba's likelihood to commit additional acts of violence could have revealed that he would remain a danger to the public if not imprisoned. Consequently, the Court cannot conclude that counsel's failure to investigate further this potentially double-edged expert testimony caused Alba constitutionally-proscribed harm. *See Skinner*, 528 F.3d at 341-42; *Martinez v. Quarterman*, 481 F.3d 249, 254-58 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1072 (2008). Furthermore, given the lack of evidence provided by Alba, the Court cannot infer that there is a reasonable probability that, had counsel further investigated Alba's purported mental deficiency, the jury would have reached a contrary result at the re-sentencing hearing. Thus, the Court finds that the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's fifth sub-claim is that his trial counsel should have challenged the process by which grand jurors are selected in Collin County. Citing authority that failure to challenge the composition of the grand jury is unreasonable under professional norms, Alba argues that a timely challenge to the Collin County grand jury system would have succeeded. For the reasons stated in the analysis of Alba's fifth claim, however, the Court finds that even if counsel had objected in a timely manner, there is not a reasonable probability that the result of Alba's state proceedings would have been different. Because Alba cannot establish prejudice, the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Wiggins*. *See* 28 U.S.C. § 2254(d)(1).

Next, in his sixth sub-claim, Alba contends that his counsel should have moved to ensure that the jury pool from which his jury was drawn reflected a fair cross-section of the community. For the reasons stated in its analysis of Alba's fourth claim, the Court finds that there is not a reasonable probability that had counsel objected, the result of Alba's trial would have been different. Because Alba cannot establish the prejudicial effect of his counsel's purported failure, the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

The seventh sub-claim of Alba's fourteenth claim is that his trial counsel should have used a peremptory challenge on a particular juror at his re-sentencing hearing, exhausted remaining peremptory challenges, and requested additional challenges. The defense originally challenged one of the potential jurors for cause, but when the challenge was denied, defense counsel chose not to use a peremptory challenge to excuse her. Alba contends that the juror could not understand even the simplest of legal concepts, improperly placed the burden of proof on the defense, and intimated that she would only be comfortable with a verdict of death. The record, however, does not support Alba's characterizations of this potential juror. Indeed, the record reveals that the juror accurately described the proper burden of proof and made a credible attempt to define "mitigation." She also explained that she was "waiting to see the facts to decide which way to go" in regards to punishment. Moreover, while an attorney's failure to exercise a peremptory challenge against a venireperson whom he has previously challenged for cause may appear questionable, further reflection on the venireperson's responses may have caused counsel to re-evaluate his assessment of the potential juror's worth. *See Gardner v. Ozmint*, 511 F.3d

420, 426 (4th Cir. 2007). Furthermore, Alba has not established that there is a reasonable probability that, had counsel used a peremptory challenge on the identified juror, the result of his re-sentencing hearing would have been different. Thus, the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1); *Clark*, 19 F.3d at 965.

In his eighth sub-claim, Alba asserts that his trial counsel should have prepared him more thoroughly before he testified at the punishment phase of his trial. The morning Alba was set to testify, his attorneys received copies of correspondence and transcripts of telephone conversations both to and from Alba while he was in jail. After Alba testified for some time on direct examination, his attorneys were granted a recess so that they could review these documents.

Alba appears to make two separate arguments in regard to these facts. He first contends that his decision to testify was not made knowingly and voluntarily because his counsel did not discuss the contents of the letters and telephone transcripts with him when they were first received. He also claims that, both before he began testifying and during the recess, his lawyers did nothing to prepare him for cross-examination. The state court, however, found that these claims were without merit. Indeed, the record shows that on the day that Alba's attorneys received the letters and transcripts, the court granted them a trial recess until the following day to allow further review and discussion with their client. Consequently, Alba's claim completely ignores the factual context in which this evidence was provided. Further, even assuming *arguendo* that Alba's counsel did not adequately prepare him for his testimony when given additional time to do so, Alba never explains how his testimony or decision to testify would have differed had he been better prepared by his attorneys. Without such evidence, the Court cannot find that there is a

reasonable probability that the result of Alba's re-sentencing proceedings would have been different had he been better prepared. As a consequence, this Court holds that the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's ninth sub-claim is that his trial counsel should not have concluded his closing argument by commenting:

> John Alba will be judged again by a higher court more powerful than us. I would not want to be John Alba that day. Our law provides a life sentence is appropriate in this case. That's what I want you to do. You're given the power over life and death. You are now asked to play God. What kind of God will you be?

The first issue for the Court is whether this argument was unreasonable under prevailing professional norms. While the Supreme Court of Pennsylvania has banned religious arguments in capital cases, commentators have noted that defense counsel frequently make religious arguments against the death penalty—at least in the South. *Compare Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa. 1991), *cert. denied*, 504 U.S. 946 (1992), *and* John H. Blume & Sherri Lyn Johnson, *Don't Take His Eye, Don't Take His Tooth, and Don't Cast the First Stone: Limiting Religious Arguments in Capital Cases*, 9 WM. & MARY BILL RTS. J. 61, 73-74 (2000). Moreover, on at least one previous occasion, the Texas Court of Criminal Appeals found a religion-based plea for mercy in a capital case to be reasonable under the prevailing professional norms in the state at that time. *See, e.g.*, *Butler v. State*, 872 S.W.2d 227, 245-46 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1157 (1995).

Alba argues, however, that his defense counsel's argument constituted deficient performance because, by its own logic, it leads to the conclusion that the jury should not vote to spare his life:

> This statement [is] a confession from Mr. Alba's lawyer that not even God, knowing all there is to know about Mr. Alba and his case, would show mercy. Thus the statement is tantamount to a confession that there is nothing mitigating about Mr. Alba. After stating that God is not going to show mercy to Mr. Alba on his judgment day, the defense attorney then told the jury that they are in God's shoes now.

While counsel's argument could be so interpreted, the Court is of the opinion that these statements are more reasonably construed as a request that the jurors follow the law of the State of Texas and impose a life sentence with an assurance that, if they are too lenient, Alba will receive harsher punishment in the hereafter. The Court deems defense counsel's choice to make this argument to be reasonable under prevailing professional norms. Consequently, because Alba cannot establish any deficiency in counsel's performance, the state court's rejection of his ninth sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

In the tenth sub-claim of his fourteenth claim, Alba avers that his trial counsel should have raised objections to improper closing arguments by the prosecution. Specifically, Alba contends that his attorney should have objected to the following purported statements:

> He's a killer(9), an executioner (13), misstatement of law - he on defense – defense put on cheap shots (93), burden shifting – requiring defense to put on other witnesses (94-95), he's a dope dealer (96) misstated fact – again on shooting T-bone (now in a drug deal)(97), he's a liar(98), prosecutor vouches for his witnesses and his case (99), he's just like that band of 8 savages that broke out down there in capital murder land, that pack of savages, they were model prisoners too, just like the defendant, he's just like them (102), uses not going to church against him (id), comment on defense again – another cheap shot from the defense (103), comment on defense – the defense is insulting you (104) request on jury to abandon the law – unless we build a cage to put people like Alba in it we need to take drastic action to protect society (106), comment on defense and misstatement of law – childhood mitigation factors are silly (107), comment on defense and misstatement of law – it was callous of defendant to make a defense (by putting on children)(109), reduces his burden and misstates law - asks jury to impute violence

to defendant even in the absence of evidence (110), he's a wild animal, a tiger (111), misstatement of law – society has a right to self defense against him(*Id.*).

Failing to object to improper closing arguments by the prosecution can constitute ineffective assistance of counsel. *See Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994). In the present case, however, the state court found that none of the statements made by the prosecution in its closing arguments were improper. Rather the trial court found that the State's arguments properly consisted of summaries of the evidence, reasonable deductions from the evidence, and pleas for law enforcement. *See Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). Alba does not explain why the state court's conclusions were incorrect. Accordingly, the Court finds that Alba has not established that, had his attorneys objected, there was a reasonable probability that the objections would have been sustained, or, if denied, that his death sentence would have been reversed on appeal. Because Alba has not established the requisite prejudice, the Court holds that the state court's rejection of Alba's tenth sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's eleventh and final sub-claim is that his lead defense attorney's frequent absences from his re-sentencing hearing constituted a denial of his right to counsel. In *United States v. Cronic*, the Supreme Court noted that the absence of counsel at critical stages of a defendant's trial uniformly results in constitutional error without any consideration of prejudice. 466 U.S. 648, 659 n.25 (1984). In the present case, however, the state court found that Alba's lead defense attorney was not absent from the courtroom during any contested proceeding. A determination of a factual issue made by a state court is presumptively correct and must be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Alba contends that "[t]he Alba trial record is

replete with notes on [lead defense counsel's] absences from the courtroom and/or late arriving. (e.g. S.F. Vol. 9 p. 108-109)." Alba cites only a single example, however, and a review of that citation shows that, at the time of defense counsel's absence, the trial was, in fact, in recess. Accordingly, the Court finds that Alba has failed to rebut the state court's factual findings by clear and convincing evidence. As such, the state court's rejection of Alba's eleventh sub-claim was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In sum, because Alba is not entitled to relief on any of his eleven sub-claims, his fourteenth claim must be rejected.

N.    Ineffective Assistance of Appellate Counsel

Alba's fifteenth claim is that his appellate counsel rendered ineffective assistance. This claim was denied on the merits by the state court; therefore, the issue before this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In *Smith v. Robbins*, the Supreme Court held that in order to obtain relief on a claim of ineffective assistance of appellate counsel a petitioner must establish that his counsel was objectively unreasonable in failing to argue certain issues on appeal and that, had his counsel acted properly, there is a reasonable probability that he would have prevailed on appeal. 528 U.S. 259, 285 (2000). Alba's fifteenth claim has four sub-claims. In his first sub-claim, Alba contends that his appellate counsel should have argued all of the jury instruction claims now raised in his habeas petition. For the reasons set forth in its analysis of those claims, however, the Court finds that there is not a reasonable probability that, had Alba's appellate counsel raised those claims in his direct appeal, his conviction would have been overturned. Thus, because Alba cannot establish

prejudice, as required by *Robbins*, the state court's rejection of this sub-claim was not contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's second sub-claim is that his appellate counsel should have argued that the trial court erred in refusing to allow his trial counsel to question jurors individually about whether the fact that Alba is Hispanic and his victims were Caucasian would impair their ability to be impartial and to follow and apply the law.

During *voir dire*, the following colloquy occurred:

Defense: This is John Alba. John is a forty-five year old Hispanic male, and John sits here, and you're asked to sit in judgment of John. John—

State: Excuse me a moment. I'm going to object to any reference to the race of this defendant. That's absolutely an issue not before the jury on his ethnicity. There's no call or place, especially in view of the entire record, for that.

Defense: Judge, I think it's painfully obvious to this jury that John's Hispanic.

Court: Well, other than introducing him—

State: May I have a ruling—May I have a ruling on my objection, please?

Court: I'm going to overrule the objection. I do think that it's clear from the surname and just from the appearance that he's Hispanic. But other than that folks, that's not material. It's no reason to change your deliberations, shouldn't influence your answers to the verdict in any way, and so we're going to stick to things that are relevant.

Alba contends that the trial judge's statement was more than a denial of the State's objection to defense counsel's reference to Alba's ethnicity; rather, it was also an admonishment to counsel that no other ethnicity comments would be acceptable from that point onward, such as references to the ethnicity of the victim. The respondent counters that the trial judge merely denied the State's objection and instructed the jury not to allow the issue of ethnicity to influence its decision. The Court agrees that by overruling the State's objection, the trial judge rejected the State's request that the defense be prevented from noting Alba's ethnicity. The court's subsequent comments

merely constituted an admonishment to the jury that the defendant's race should not color their deliberations.

In *Turner v. Murray,* the Supreme Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. 28, 36-37 (1986). In the present case, however, defense counsel never requested that prospective jurors be informed of the victims' race or attempted to make inquiries into possible racial bias. Moreover, even if the Court were to accept Alba's argument that the trial court's admonition to "stick to things that are relevant" should be interpreted as implying that counsel could not discuss the victims' ethnicity or inquire into possible juror bias concerning interracial marriage or interracial homicide, defense counsel failed to object to the court's statement at the time it was made. Indeed, Alba did not voice any complaints about this instruction until after his conviction was affirmed on appeal. Accordingly, the Court cannot say that there was a reasonable probability that this claim would have prevailed on appeal. The Court therefore finds that the state court's rejection of Alba's second sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Turner* and *Robbins*. *See* 28 U.S.C. § 2254(d)(1).

Alba's third sub-claim is that his appellate counsel should have appealed the trial court's denial of his motion for a continuance. Alba's argument, however, is based upon an incorrect premise; this issue was clearly raised in his direct appeal. *See Alba*, 2003 WL 1888989, at *1. Accordingly, Alba's third sub-claim is without foundation.

In his fourth and final sub-claim, Alba avers that his appellate counsel should have appealed the trial court's denial of his motion to exclude discussion of Garcia and Gurule. For

the reasons set forth in its analysis of Alba's thirteenth claim, the Court finds that, had appellate counsel raised this claim, there is not a reasonable probability that Alba's appeal would have succeeded. Because Alba cannot establish prejudice, the state court's rejection of this sub-claim was not contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Having failed to demonstrate his entitlement to relief on any of his four sub-claims, Alba's fifteenth claim is denied.

O.  Exclusion of Victim's Affairs

Alba's sixteenth claim is that the trial court's exclusion of evidence of Wendy's alleged affairs, which he sought to raise as mitigation evidence, forced Alba to testify in violation of his rights under the Fifth and Sixth Amendments and the Due Process Clause. Because this claim was denied on the merits by the state court, the issue before this Court is whether the state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

At trial, Alba argued that he killed his wife in the heat of passion after being provoked when she told him of a sexual liaison with their neighbor, Mike Engle ("Engle"), while Alba was in jail. To avoid testifying and being subject to cross-examination, Alba attempted to show through circumstantial evidence that he knew about the affair at the time of the homicide. This evidence included confirmation by Engle that he had a one-night stand with Alba's wife, as well as testimony that after Alba shot his wife, neighbors warned Engle to be wary of him. The State moved to prevent Alba from introducing this evidence, as well as evidence of additional infidelities, on the ground that the victim's sexual conduct was irrelevant unless Alba introduced

evidence that he knew she had an intimate relationship with Engle. Because the Court granted the motion, Alba argues that he could only raise this defense through his own testimony.

In support of his claim that his rights were violated, Alba relies on *Washington v. Texas*, in which the Supreme Court held that the Due Process Clause guarantees "the right to present a defense [and] the right to present the defendant's version of the facts. . . ." 388 U.S. 14, 19 (1967). Because Alba presented his version of the facts through his own testimony, the state court's rejection of his claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined in *Washington*. *See* 28 U.S.C. § 2254(d)(1).

The Court recognizes that when a defendant's state of mind is at issue and the only admissible evidence on that issue is the defendant's own testimony, a tension exists between the right to put on a defense and the right to remain silent. Alba, however, cites no authority, and the Court has found none, holding that a waiver of one's right to remain silent in order to present such testimony should be deemed involuntary. Indeed, at least one federal appellate court has found that a perceived obligation to testify in response to unfavorable evidence does not constitute compulsion for purposes of the Fifth Amendment. *See United States v. Martinez-Montilla*, 82 F. App'x 53, 55 (2d Cir. 2003). Thus, Alba's sixteenth claim is unfounded.

P.    Failure to Exclude References to Defendant's Website

Alba's seventeenth claim is that the trial court erred in denying his motion to exclude references to a website maintained on his behalf, as such evidence indicated that a death sentence was previously imposed in this case and forced him to testify in violation of his rights under the Fifth and Sixth Amendments and the Due Process Clause. The state court found that this claim was procedurally barred because Alba did not object during the re-sentencing hearing and did not

raise the issue in his direct appeal of that hearing. The state court also denied the claim on the merits. Because Alba has failed to establish either that he had good cause for not raising this claim at his re-sentencing hearing or on direct appeal from that hearing, or that a fundamental miscarriage of justice would occur if the Court did not address the merits of his claim, this Court is barred from reviewing this claim under the doctrine of procedural default. Consequently, Alba's seventeenth claim must be dismissed.

Q.     Execution of the Mentally Ill

In his eighteenth claim, Alba posits that because he suffers from impulsive aggression, which he describes as an illness similar to mental retardation, executing him would constitute cruel and unusual punishment. The state court found that this claim was procedurally barred because Alba did not raise it at his re-sentencing hearing, and it also denied the claim on the merits. Given that the Court opts to address this claim on the merits rather than resolve it on procedural grounds, the issue to be decided is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In *Atkins v. Virginia*, the Supreme Court held that executing a mentally retarded person violates the Eighth Amendment's prohibition against cruel and unusual punishment. 536 U.S. 304, 321 (2002). The Court stated that, although persons with mental retardation may know right from wrong, "they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. These limitations

diminish their personal culpability and, in some cases, render them vulnerable to wrongful execution. *Id.* at 318-21.

Alba contends that he suffers from impulsive aggression due to low levels of serotonin in his brain. Because this condition allegedly renders him unable to control violent impulses, Alba avers that the state court unreasonably refused to extend *Atkins* to his circumstances. The Court notes, however, that the Fifth Circuit recently refused to extend the *Atkins* rationale to claims of mental illness in general. *See Shisinday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007), *cert. denied*, 129 S. Ct. 62 (2008). Based upon this precedent, the Court finds that the state court's rejection of this claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Alba's eighteenth claim is denied.

R.     Incorrect Burden of Proof

Alba's nineteenth claim is that Texas's capital sentencing scheme violates the Sixth, Eighth and Fourteenth Amendments by permitting a jury to find facts by a standard of less than "beyond a reasonable doubt." The state court found that this claim was procedurally barred because Alba did not raise it in his direct appeal from his re-sentencing hearing and also denied the claim on its merits. The Court elects to decide this claim on the merits rather than consider the procedural default issue. Consequently, the Court must determine whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's nineteenth claim contains two sub-claims. The first sub-claim is that he was denied due process of law because the trial court admitted evidence of prior unadjudicated offenses and

bad acts.  Relying on *Ring v. Arizona*, Alba argues that a statutory capital punishment scheme

must require that aggravating factors, including unadjudicated offenses, be found by a jury beyond

a reasonable doubt.  536 U.S. 548 (2002).  In *Brown v. Dretke*, however, the Fifth Circuit rejected

this precise argument.  419 F.3d 365, 376-77 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006).

Thus, the Court finds that the state court's rejection of Alba's first sub-claim was neither contrary

to, nor the result of an unreasonable application of, clearly established federal law.  *See* 28 U.S.C.

§ 2254(d)(1).[4]

Secondly, Alba claims that the mitigation special issue presented under the Texas capital

punishment scheme is unconstitutional, as it fails to require that a jury find beyond a reasonable

doubt that mitigating circumstances which would support a life sentence do not exist.  In *Ring*, the

Supreme Court declined to address whether its holding extended to mitigating factors.  536 U.S.

at 597 n.4.  Moreover, in *Granados v. Quarterman*, the Fifth Circuit denied a claim identical to

that proffered by Alba.  455 F.3d 529, 536-37 (5th Cir.), *cert. denied*, 549 U.S. 1081 (2006).

Hence, this Court finds that the state court's rejection of Alba's second sub-claim was neither

contrary to, nor the result of an unreasonable application of, *Ring*.  *See* 28 U.S.C. § 2254(d)(1).

Because Alba is not entitled to relief on either of his two sub-claims, his nineteenth claim must be

rejected.

---

[4]     Alba also argues that if the Court rejects his claim that unadjudicated offenses can only be
presented after showing beyond a reasonable doubt that they had been committed, the Court should grant
his petition on this issue to ensure that the State had enough evidence to prosecute an unadjudicated offense
prior to admitting it in a capital trial.  The Court observes that, in order to admit evidence of extraneous
offenses, the Fifth Circuit has long required the prosecution to submit proof that the defendant committed
the offense and that there is a rational connection to the offense charged.  *See Wood v. Quarterman*, 503
F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1874 (2008); *Enriquez v. Procunier*, 752 F.2d
111, 115 (5th Cir. 1984), *cert. denied,* 471 U.S. 1126 (1985).  Alba, however, does not argue that the
State failed to meet either of these prerequisites.  Hence, the Court need not address this argument.

S.        Failure to Give Limiting Instruction

For his twentieth claim, Alba alleges that the trial court failed to give a limiting instruction regarding the meaning of inherently vague terms used in special issue questions in violation of the constitutional prohibition against arbitrary and/or capricious imposition of the death penalty. The state court found this claim to be procedurally barred because Alba did not raise it in either his re-sentencing hearing or on his direct appeal from that hearing. The court also denied Alba's claim on its merits. As the Court elects to review this claim on the merits, the issue to be resolved is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

Alba takes issue with four terms contained within two of the four special issues propounded to the jury at his re-sentencing hearing. Specifically, Alba contests the second special issue, which asked the jury whether he acted deliberately in killing his wife. Alba also requests review of the third special issue, inquiring of the jury whether it believed there was a probability that he would commit future criminal acts of violence that would pose a continuing threat to society. Alba contends that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," as used in these special issues, are so vague that they would not preclude arbitrary and/or capricious imposition of the death penalty.

In *Tuilaepa v. California*, the Supreme Court held that capital punishment selection factors are not unconstitutionally vague if they have "some common-sense core of meaning . . . that criminal juries should be capable of understanding." 512 U.S. 967, 973 (1994) (internal quotation omitted). Additionally, the Fifth Circuit has determined that juries should be able to understand

41

the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society." *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993). Consequently, the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Tuilaepa*. *See* 28 U.S.C. § 2254(d)(1). Hence, Alba's twentieth claim is groundless.

      T.      Unconstitutional Execution Method

      Alba's twenty-first claim is that the method of execution utilized in Texas violates the Eighth and Fourteenth Amendments. The Texas lethal injection procedure involves the successive administration of sodium thiopental (which renders the prisoner unconscious), pancuronium bromide (which paralyzes the prisoner and stops his breathing), and potassium chloride (which stops the prisoner's heart). Alba contends that this procedure has a strong likelihood of creating gratuitous suffering. He alleges that pancuronium bromide neutralizes the anaesthetic effects of sodium pentothal, causing the inmate to remain conscious though paralyzed, and that potassium chloride causes excruciating pain to a conscious person. Alba avers that such suffering violates the Eighth Amendment's prohibition against cruel and unusual punishment.

      At the time he filed his petition for a writ of *habeas corpus* in this Court, Alba had not presented this claim to the state courts. Accordingly, the Court granted permission for Alba to return to state court to exhaust this claim, where it was dismissed on procedural grounds. *See Ex parte Alba*, 256 S.W.3d at 687. On July 30, 2008, the Court granted Alba leave to file a supplemental brief, addressing why the Court was not barred from reviewing his twenty-first claim under the doctrine of procedural default. On October 2, 2008, Alba filed his supplemental brief.

This document, however, contains no argument warranting review of the claim. Alba's twenty-first claim is, therefore, procedurally barred.

Moreover, with regard to the substance of his twenty-first claim, the Supreme Court recently upheld lethal injection as a constitutionally permissible form of execution. *See Baze v. Rees*, 128 S. Ct. 1520, 1538 (2008). Further, the Court specifically held that a state's decision to administer pancuronium bromide as part of a three-drug execution protocol does not offend the Eighth Amendment. *Id.* at 1535. Accordingly, Alba's twenty-first claim also fails on the merits.

U.     Failure to Give Instruction Regarding Parole

Alba's twenty-second claim is that, although allowed in a non-capital case, the Texas sentencing scheme forbids a trial court from giving an instruction on the parole implications of a life sentence in a capital case in violation of the Equal Protection Clause. The state court found that this claim was procedurally barred because Alba did not raise it at either his re-sentencing hearing or on his direct appeal from that hearing, and it also denied the claim on its merits. As the Court elects to review the merits of this claim, the issue for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

In *Romer v. Evans*, the Supreme Court held that state laws that neither burden a fundamental right nor target a suspect class do not violate the Equal Protection Clause so long as they bear a rational relationship to a legitimate end. 517 U.S. 620, 631 (1996). Alba asserts that the State of Texas should provide the same amount of parole information to juries in all criminal cases and that it has no rational reason for withholding such information in capital cases. The Fifth Circuit has explicitly held, however, that the Texas prohibition on consideration of parole

eligibility in capital cases meets the rational basis requirement. *See Green v. Johnson*, 160 F.3d 1029, 1044 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999). The Court, therefore, finds that the state court's rejection of this claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Romer*. *See* 28 U.S.C. § 2254(d)(1). Consequently, Alba's twenty-second claim lacks merit.

V.      Failure to Give Instruction Regarding Parole Eligibility

In his twenty-third claim, Alba contends that the trial court violated the Eighth and Fourteenth Amendments by failing to instruct the jury that a life sentence would render him ineligible for parole for twenty years. The state court found that this claim was procedurally barred because Alba did not raise it at either his re-sentencing hearing or on his direct appeal. The state court also denied this claim on its merits. Because the Court opts to consider the merits of Alba's claim, the issue requiring resolution is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Alba's twenty-third claim contains two sub-claims—one based upon the Due Process Clause of the Fourteenth Amendment and the other premised on the Eighth Amendment. Regarding due process, the Supreme Court has consistently held that when a defendant's future dangerousness is at issue and state law at the time of trial prohibits the defendant's release upon parole, due process requires that the sentencing jury be informed that the defendant would not be eligible for parole. *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994); *see also Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). The law in effect in Texas at the time of Alba's re-sentencing hearing allowed only a sentence of death or the imposition of a term of life imprisonment with the

possibility of parole. In such a situation, the Fifth Circuit has held that due process does not compel instructions regarding parole. *See Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). Consequently, the state court's rejection of Alba's due process sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* U.S.C. § 2254(d)(1).

In connection with Alba's cruel and unusual punishment sub-claim, the Supreme Court in *Simmons* expressly declined to address whether its holding was also compelled by the Eighth Amendment. 512 U.S. at 162 n.4. In addition, the Fifth Circuit has held that the Texas position on parole eligibility evidence in capital cases does not violate the Eighth Amendment. *See Johnson*, 68 F.3d at 112. Thus, given that the Supreme Court has yet to determine the law on this issue and the Fifth Circuit has found that the Eighth Amendment does not require parole eligibility instructions in Texas, the state court's rejection of this sub-claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Because Alba is not entitled to relief on either of his two sub-claims, his twenty-third claim must be denied.

W.      Length of Time Served on Death Row

Alba's twenty-fourth claim is that his prolonged stay on death row constitutes cruel and unusual punishment. The state court found that this claim was procedurally barred because Alba did not raise it at either his re-sentencing hearing or on his direct appeal and also denied the claim on its merits. The Court opts to review this claim on the merits. As such, the issue to be determined is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In *Gregg v. Georgia*, the Supreme Court found that the death penalty is not cruel *per se* because it serves two societal purposes: deterrence and retribution. 428 U.S. 153, 183-87 (1976). The Court has long held, however, that punishments which involve an unnecessarily lingering death are cruel. *See In re Kemmler*, 136 U.S. 436, 447 (1890). In an attempt to expand on this idea, Alba suggests that executing him after many years of incarceration on death row would violate his rights under the Eighth Amendment. In support of this argument, Alba contends that long delays between sentencing and execution are comparable to lingering forms of execution.

On two previous occasions, the Supreme Court has denied applications for writs of *certiorari* to consider whether lengthy delays between sentencing and execution constituted cruel and unusual punishment. *See Elledge v. Florida*, 525 U.S. 944 (1998); *Lackey v. Texas*, 514 U.S. 1045 (1995). Moreover, the Fifth Circuit recently held that a twenty-four-year delay prior to execution did not violate the Eighth Amendment. *See Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007). Thus, in accordance with Fifth Circuit precedent and the Supreme Court's refusal to address the issue, this Court finds that the state court's rejection of this sub-claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Thus, Alba's twenty-fourth claim lacks merit.

X.      Cumulative Effect of Previous Claims

Alba's twenty-fifth and final claim is that the cumulative effect of the above enumerated constitutional violations denied him due process of law under the Fifth and Fourteenth Amendments even if no separate infraction rises to that magnitude. Because this claim was denied on the merits by the state court, the issue for this Court is whether this denial was contrary to, or

involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In *Kyles v. Whitley*, the Supreme Court held that whether prejudice existed in a case involving the suppression of several items of evidence should be determined by considering the items collectively, rather than individually. 514 U.S. 419, 436 (1995). When evaluating claims of cumulative prejudice resulting from constitutional violations, however, the Fifth Circuit has directed courts to ignore claims that are barred from review under the doctrine of procedural default as well as those claims which the court finds to be meritless or without some level of prejudice. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996), *cert. denied*, 519 U.S. 1094 (1997). Only Alba's twelfth claim arguably passes muster under this standard. Because there are no other viable claims with which this claim could be cumulated, the Court finds that the state court's rejection of Alba's cumulative claim was not contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Consequently, as with his other claims, Alba's twenty-fifth claim must fail.

VI.     Conclusion

For the above reasons, the Court finds that Alba's first through third, seventh through eleventh, seventeenth, and twenty-first claims are barred from review under the doctrine of procedural default, and those claims are dismissed with prejudice. Additionally, because they are without merit, the Court rejects Alba's fourth through sixth, twelfth through sixteenth, eighteenth

through twentieth, and twenty-second through twenty-fifth claims. Consequently, Alba's petition for a writ of *habeas corpus* is DENIED. An order and judgment to this effect will be entered.

SIGNED at Beaumont, Texas, this 22nd day of December, 2008.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE